## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**DANIEL C. McPHADDEN,**

      **Plaintiff,**

**vs.**                                       **CASE NO. 1:07cv15-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

Plaintiff, Daniel C. McPhadden applied for supplemental security income benefits. Plaintiff was a minor at the time of his application, and his application was filed by his mother, Melva McPhadden.  He has since attained the age of 18 and brings this suit on his own behalf, through counsel.

Plaintiff was 20 years old at the time of the administrative hearing and has a 7th grade education. He has worked in his adult life for short periods of time as a cook at a fast food restaurant and doing cement work. Plaintiff alleges disability due to schizophrenia and depression. The Administrative Law Judge found that Plaintiff was not disabled as defined by Social Security law, either as a child or as an adult.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached

are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

A child's claim for supplemental security income benefits is analyzed by following the rules set forth in 20 C.F.R. § 416.924, et seq.  The Commissioner "will consider the combined effects of all [the child's] impairments upon [the child's] overall health and functioning," and is to evaluate "any limitations in [the child's] functioning that result from . . . symptoms, including pain."  20 C.F.R. § 416.924(a).  The claim is to be evaluated in three steps:

1.    Is the child currently engaged in substantial gainful activity?

2.    Does the child have any severe impairments?

3.    Does the child have any severe impairments that meet, are medically equal to, or functionally equal in severity to, an impairment listed in Appendix 1 of 20 C.F.R. Part 404?

20 C.F.R. §§ 416.924(a)-(d).

The claim is denied at step two if the child does not have a severe impairment.  A "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" is not a "severe impairment."  20 C.F.R. § 416.924(c).

At step three, the issue is whether the impairment meets or equals a listed impairment is the same as for evaluation of an adult claim.  If the impairment neither meets nor equals a listed impairment, the Commissioner must next determine whether

the impairment is functionally equal in severity to a listed impairment.  This step is

unique to child supplemental security income disability claims.  There is no "residual

functional capacity" determination, and no determination of ability to perform work.

As to functional equivalency, the regulations provide:

> If you have a severe impairment or combination of impairments that does
> not meet or medically equal any listing, we will decide whether it results in
> limitations that functionally equal the listings.  By "functionally equal the
> listings," we mean that your impairment(s) must be of listing-level severity;
> i.e., it must result in "marked" limitations in two domains of functioning or
> an "extreme" limitation in one domain, as explained in this section.

20 C.F.R. § 416.926a(a).  The domains are:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and,

6. Health and physical well-being.

20 C.F.R. § 926a(b)(1)(i) – (vi).

"[A] 'marked' limitation in a domain [will be found] when your impairment(s)

interferes seriously with your ability to independently initiate, sustain, or complete

activities."  20 C.F.R. § 416.926a(e)(2)(i).  It "means a limitation that is 'more than

moderate' but 'less than extreme.' " *Id.*

> If you are a child of any age (birth to the attainment of age 18), we will find
> that you have a "marked" limitation when you have a valid score that is
> two standard deviations or more below the mean, but less than three
> standard deviations, on a comprehensive standardized test designed to
> measure ability or functioning in that domain, and your day-to-day
> functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii).

"[A]n 'extreme' limitation in a domain [will be found] when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

> If you are a child of any age (birth to the attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(3)(iii).

The Commissioner's regulations provide that test scores are not to be relied upon without considering other evidence, and "[n]o single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain."  20 C.F.R. § 416.926a(e)(4)(i).  Test scores are considered "together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others."  20 C.F.R. § 416.926a(e)(4)(ii).

To decide whether the claimant has a "marked" or an "extreme" limitation, the Commissioner:

> will consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects.  We will consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§416.924a, 416.924b, and 416.929.

20 C.F.R. § 926a(e)(1)(i).

The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents.  Standard scores (e.g., percentiles) can be converted to standard deviations.  When you have such scores, we will consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.

20 C.F.R. § 926a(e)(1)(ii).

The Commissioner analyzes an adult claim in five steps.  20 C.F.R. §

404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**[1]

At the administrative hearing on January 19, 2006, Plaintiff testified that he resided with his mother.  R. 270.  He attended regular classes in seventh grade, but was not promoted to eighth grade.  R. 271.  He did not complete the eighth grade.  *Id*. He said that he withdrew from school because "everything was going downhill" mentally. R. 272.  He said he had problems focusing on class work.  R. 273.  He also had problems with his memory.  *Id*.

After he withdrew from school, Plaintiff just stayed home and watched television. R. 274.  He said he watched television two or three hours a day, and the rest of the day he did "nothing."  *Id*.  He could not remember how much time he spent socializing with friends, but it was "not too much."  *Id*.

Plaintiff said he tried to go to work at age 18.  R. 275.  He worked at MacDonald's as a cook.  *Id*.  He said he held that job for three or four weeks and quit because he was "hearing things," that is, he was hearing voices, and could not "deal with" being around "too many people."  R. 275-276.  He said that he had trouble concentrating because of the voices.  R. 276.  He said that his supervisors noticed that he was losing concentration.  *Id*.

Plaintiff said he next worked at "Florida Septic," pouring cement.  R. 277.  He said that he continued to hear voices and could not do the job.  *Id*.  He left that job on his own.  R. 278.

_____

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw.  Only the PDR 2005 and earlier are available to the court.  Medical terms come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).

Plaintiff said that his ability to concentrate and remember had not gotten better in the last year or two.  R. 278.  He still hear voices.  *Id.*  He said he was taking medication, but he could not remember the name of his medication.  R. 278-279.

Plaintiff's mother testified that Plaintiff was living with her.  R. 280.  She corrected his testimony, stating that he had been promoted to eighth grade, but at the end of eighth grade, was asked to repeat the grade.  R. 281.  He was then put into a Christian school.  *Id.*  She said he did not complete eighth grade because he had a lot of trouble concentrating and staying focused.  *Id.*  The school did not offer any special assistance other than repeating the eighth grade.  *Id.*  She said he was having "a lot of trouble interacting with other people and concentrating on the things that he needed to do at home and in school."  *Id.*  She said he "kind of withdrew from his friends.  He would stay home a lot."  R. 282.

Plaintiff's mother disagreed with his testimony as to the number of hours he watched television; she said it was "a lot more" than two or three hours a day.  R. 282.  She had tried to home-school him, but he "wasn't able to do it."  *Id.*  She said she came home one day, and Plaintiff had placed blankets all over the windows, afraid that someone was looking in.  *Id.*

She testified that when he started the job at MacDonald's, he was taking medication and was sleeping a lot.  R. 283.  He had a hard time getting going "with all the medication that he takes."  *Id.*  She had noticed that from one medication, his jaw locked and he had trouble closing his mouth, and another medication caused blurred vision.  R. 284.  She also said that Plaintiff did not routinely take his medications as prescribed.  *Id.*  He did not like taking Lexapro in the day time because it made him

sleepy.  R. 285.  He had problems remembering to take his medication and to do

chores.  R. 286.  Plaintiff's mother said that in the evenings, her son talked to a couple

of people by telephone and he had a cousin who would sometimes visit.  R. 285.

**Medical Evidence**

On March 20, 2003, Plaintiff was admitted to the Shands at Vista treatment

facility for "crisis" stabilization.  R. 136-137.  His admission diagnosis was psychosis, not

otherwise specified, and to rule out schizophrenoform disorder versus bipolar disorder

with psychotic features.  R. 136.  His global assessment of function (GAF) score[2] was

10.[3]  *Id*.

A history of illness was prepared on admission.  It states that Plaintiff was then

17 years old.  *Id*.  He had a 2 year history of marijuana abuse, smoking four or five joints

every day.  R. 136-137.  He said he had stopped use of marijuana four days earlier and

started having command persecutory auditory hallucinations.  R. 136.  The voices were

"many in number."  *Id*.  Plaintiff expressed grandiose thoughts, stating that he had

"special powers" and could read another person's mind.  *Id*.  He related that he had had

tactile and visual hallucinations, in addition to the auditory hallucinations.  *Id*.  He had

paranoid thoughts.  *Id*.

---

[2] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.'  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

[3] A GAF score of 10 indicates "persistent danger of severely hurting self or others . . . OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."  Doc. 15-2, p. 2.

Zyprexa[4] was initiated to address the psychosis.  R. 137.  Three days later, it was observed that Plaintiff was sad and "isolated on the unit."  R. 138.  He continued to have multiple auditory hallucinations.  *Id.*  He was so agitated on March 24, 2003, that escape precautions were instituted, and he was having muscle spasms consistent with dystonia.[5]  *Id.*  During the day, Plaintiff heard voices telling him to "run away."  *Id.*

On March 26, 2003, Plaintiff "appeared somewhat agitated and paranoid again." R. 138.  A family meeting was scheduled for March 27, 2003, and Plaintiff said he thought that people were putting things into his food.  *Id.*  He participated only minimally in group activities on the ward.  *Id.*  He reported hearing mumbling voices and could read other people's minds only if he tried.  *Id.*  The dosage of Zyprexa was increased. *Id.*  On March 28, 2003, it was changed to Zyprexa Zydis.[6]  *Id.*  On March 31, 2003, Plaintiff continued to "mumble occasionally."  *Id.*  He was "mildly guarded and much less paranoid."  *Id.*  On April 1, 2003, he "was noted to be much improved.  He is denying any suicidal or homicidal ideation and reported a happy mood."  *Id.*  He was discharged on April 1, 2003, "with adequate subsequent follow-up" with Meridian Behavioral Health

---

[4] Zyprexa is a psychotropic agent used for the treatment of schizophrenia and as a short-term treatment for manic episodes associated with Bipolar I disorder.  PHYSICIANS' DESK REFERENCE (2004), pp. 1857-1858.

[5] Dystonia means dyskinetic movements due to disordered tonicity of muscle. Dyskinesia is the distortion or impairment of voluntary movement, as in tic, spasm, or myoclonus.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[6] Zyprexa Zydis is a form of Zyprexa (olazapine) in an orally disintegrating tablet form.  PHYSICIANS' DESK REFERENCE (2005).

with Dr. Sageet.  *Id.*  He was discharged with a GAF score of 45.[7]  R. 136.  The diagnosis on discharge was schizophreniform disorder.  *Id.*

Plaintiff was seen again on May 1, 2003, at Shands Psychiatry Clinic by Ede O. Fecska, M.D.  R. 155-158.  This was a followup examination after having been discharged from Vista.  R. 155.  Plaintiff reported that he had had marked improvement in his hallucinations and delusions.  *Id.*  He continued to have auditory hallucinations, however, but said that the "voices are really quiet" and he could not "make out what they are saying."  *Id.*  He continued to report a depressed mood that had been present for the prior two years.  *Id.*  He said he no longer felt paranoid.  *Id.*  He said he had poor sleep, poor appetite, and lacked motivation to engage in activities he used to enjoy.  *Id.*

Plaintiff said that he had only attended school for the prior two years on a "sporadic basis," and "demonstrated over that time period the aforementioned neurovegetative symptoms of depression."  R. 156.  He stated that he primarily wanted help with his depression.  *Id.*  Plaintiff said that he had stopped using marijuana two months prior, but had used it twice in the intervening two months and had had visual hallucinations.  *Id.*  He said he knew that marijuana exacerbated his psychosis.  *Id.*  He was currently taking Zyprexa Zydis and Cogentin.[8]  *Id.*

---

[7] GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Doc. 15-2, p. 2.

[8] Cogentin is used in adjunct therapy for all forms of parkinsonism.  It is also useful in the control of extrapyramidal disorders (except tardive dyskinesia) due to neuroleptic drugs (e.g., phenothiazines).  PHYSICIANS' DESK REFERENCE (2005).

On examination, Dr. Fecska found Plaintiff to be well-groomed but demonstrated "markedly decreases psychomotor activity with poor eye contact."  R. 156.  Plaintiff also "demonstrated markedly decreased rate, rhythm and volume of speech," "marked poverty of speech and poverty of content of speech," and "blunt affect."  *Id.*  His thought content was found to be normal except for the auditory hallucinations.  R. 156-157.  He was found to have "fair insight and fair judgment."  R. 157.  It was noted that Plaintiff "continues to complain of depressed mood, anorexia, insomnia, anhedonia, anergia, decreased activity and irritability."  R. 157.  The diagnosis was "[s]chizophrenia, paranoid type; evaluate for schizoaffective disorder, depressed type; evaluate for MDD [manic depressive disorder] with psychotic features."  *Id.*  The physician assigned a GAF score of 55.[9]  *Id.*  It was thought that Plaintiff demonstrated "marked improvement of symptoms of psychosis with initiation of Zyprexa."  *Id.*  Plaintiff was taking Cogentin for side effects of Zyprexa "consistent with akinesthesia."  *Id.*  He and his mother were warned of the potential side effects of Zyprexa, including tardive dyskinesia and "extrapyramidal side effects . . . including pseudo-Parkinsonism."  *Id.*

With regard to depression, Dr. David Husted, with the approval of Dr. Fecska, wrote:

> Mr. McPhadden does demonstrate symptoms of depression.  In the setting of schizophrenia it is common to see amotivation and blunted affect.  However, most schizophrenics tend to not be disturbed by these symptoms.  Mr. McPhadden is clearly disturbed by his lack of desire to do anything and his depressed mood.  Mr. McPhadden also describes other

---

[9] GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Doc. 15-2, p. 2.

neurovegetative symptoms which he finds ego-dystonic.  Therefore, we
suspect that the patient does have depression.  The patient has a history
of these symptoms that date back to approximately two years ago and
have progressively worsened.

R. 157.  Zoloft was prescribed.  *Id*.

Plaintiff was treated at Meridian Behavioral Health Care from May 6, 2003,

through April 22, 2004.  R. 171-216.  On May 6, 2003, he was observed to be anxious

and sad, and was having auditory hallucinations consisting of constant noise and

unintelligible voices.  R. 215-216.

Plaintiff was 18 years old on July 13, 2003.  R. 16.  The next undated note (which

states that he was discharged from Vista three or four months ago with a question

mark) relates that Plaintiff was still using marijuana about once a week, but did not like

how it made him feel.  R. 214.  He had stopped taking Zyprexa due to side effects (stiff

muscle reaction which had scared him).  *Id*.

On July 20, 2003, a twelve page medical services progress note was entered at

Meridian Behavioral Healthcare, Inc.  R. 199-211.  He was brought in by his mother for

medication management and counseling.  R. 200.  His thought content was

"unremarkable," except he had low motivation.  R. 201.  He was cooperative and

attentive.  *Id*.  No delusions were noted.  *Id*.  While his thought processes were

organized and his perception was intact, he reported having auditory hallucinations

continuing at a low level, in the background.  R. 202.  His concentration was "not intact,"

only "fair."  *Id*.  He was drowsy related to medications, and had low motivation for

problem solving.  *Id*.  Plaintiff's affect was flat.  *Id*.  He appeared happier, though, as

related by his mother.  *Id*.  His mood was anxious.  R. 203.  His sleep was not disturbed.

R. 205.  He had gained 60 pounds since the start of medication in March, a few months earlier.  *Id*.  His judgment was only fair.  *Id*.  Plaintiff was assigned a GAF score of 40, with 60 the highest that year.  R. 209.  His diagnosis was schizophrenia, rule out substance abuse and major depression with psychotic features in partial remission.  *Id*.

On November 21, 2003, Plaintiff was seen for a scheduled update.  R. 182-191. Plaintiff denied any current usage of marijuana.  R. 183.  His schizophrenic condition was seen as a potential barrier for independent living.  R. 184.  Plaintiff said he was currently "hearing voices."  R. 185.  It was noted that "progress was minimal overall." *Id*.  He continued to have auditory hallucinations.  *Id*.  He was reportedly compliant with his medications.  R. 186.  His daily needs were provided by his mother.  R. 187.  It was noted that Plaintiff's schizophrenic symptoms cause him "to usually isolate himself."  R. 189.

Plaintiff returned for medication management twelve times, on August 18, 2003, August 25, 2003, October 2, 2003, October 23, 2003, November 21, 2003, November 25, 2003, December 9, 2003, January 5, 2004, February 2, 2004, March 2, 2004, March 25, 2004, and April 22, 2004.  R. 198, 197, 193, 192, 182-191, 181, 180, 179, 178, 176-177, 172, 171.  He failed to show up for his appointment three times in this period, on September 16, 2003, March 16, 2004, and March 18, 2004.  R. 195, 175, 174.  On March 23, 2004, he did not fail to show up for an appointment; the appointment was simply rescheduled.  R. 173.  He was seen again on March 25, 2004, and April 22, 2004.  R. 172, 171.

On March 2, 2004, during a medication visit, it was found that Plaintiff's GAF score was 35.[10]  R. 177.

## Legal Analysis

Plaintiff argues that the Administrative Law Judge erred by not finding that Plaintiff is disabled due to paranoid schizophrenia.  He contends that the opinions of his treating physicians were not given substantial weight.

The ALJ determined that Plaintiff had not proven a childhood impairment.  He found that Plaintiff's mental impairment did not meet or equal either Listing 112.03 or 112.09.  R. 18.  He reasoned that in May, 2003, a GAF score of 55 was assigned.  *Id*. He also found that Plaintiff's impairments were not functionally equivalent in severity to a listed impairment.  R. 19.  He found that the medical evidence for a childhood impairment was "very, very limited."  *Id*.  He considered evidence only to July, 2003, when Plaintiff became 18 years old.  R. 20.  He concluded that Plaintiff's condition imposed only slight limitations upon his ability to acquire and use information, to attend to and complete tasks, and to interact and relate with others, and that Plaintiff had no limitation in ability to move and manipulate objects, care for personal needs, and maintain health and physical well-being.  R. 18-19.  Thus, he found no childhood impairment.  R. 21.

---

[10] A GAF score between 31 and 40 indicates that there is "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."

The ALJ determined that Plaintiff's testimony, and that of his mother, were not entirely credible. R. 20. He rejected that testimony, finding that Plaintiff's treatment history was "non-aggressive" and "sporadic," and he found that the testimony was inconsistent with Plaintiff's "activities of daily living." *Id.* At later point in the opinion, when discussing Plaintiff's adult impairment claim, the ALJ again discounted this testimony because "not supported by the objective clinical and laboratory findings of record, the claimant's activities of daily living, and the claimant's full attention, appropriate manner and appropriate responses to questions at the hearing . . . ." R. 22. The ALJ also "questioned" Plaintiff's credibility due to varying responses concerning marijuana use, and he found that Plaintiff's mental health treatment was "sporadic" with "frequent[ly] missed appointments." *Id.* He concluded that Plaintiff had the residual functional capacity to perform simple, unskilled, low stress work, with one, two, or three step instructions, lift and carry 50 pounds occasionally, lift and carry 25 pounds frequently, and sit, stand, or walk 6 hours in an 8 hour day. *Id.*

Two basic legal principles govern this court's review of this decision. The first concerns the manner in which the testimony of a claimant concerning the degree of impairment must be evaluated. Pain and other symptoms reasonably attributed to a medically determinable impairment (such as the limitations that might be experienced by someone suffering from schizophrenia) are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing: (1) evidence of an underlying medical condition; and (2) either

> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so. *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated for

disregarding the claimant's subjective testimony must be based upon substantial

evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991). It is not necessary that the ALJ expressly identify this circuit's standard

for evaluation of subjective testimony if his findings "leave no doubt as to the

appropriate result" under the law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th

Cir. 1986).

      The second legal principle concerns the way that opinions of treating physicians

must be evaluated. The opinion of a claimant's treating physician must be accorded

considerable weight by the Commissioner unless good cause is shown to the contrary.

Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). The reasons for giving little

weight to the opinion of a treating physician must be supported by substantial evidence.

Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992). Good cause to afford less

weight to the opinion of a treating physician exists "when the:  (1) treating physician's

opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or

(3) treating physician's opinion was conclusory or inconsistent with the doctor's own

medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004). The

ALJ must clearly articulate the reasons for rejecting the treating physician's opinion.  *Id.*, at 1241.

With respect to the rejection of the childhood impairment claim, the evidence was not "very, very limited."  While the period of onset of the impairment within the childhood years was very short, from March, 2003, to July, 2003, when Plaintiff turned 18 years old, the evidence during those months was extensive and significant.  The evidence in the year following, an adult year, was also extensive.

Second, the GAF score of 55 in May, 2003, was not substantial evidence in this record to support a rejection of the childhood impairment claim.  Plaintiff was assigned five GAF scores over a period of one year: 10 on March 20, 2003; 45 on April 1, 2003; 55 on May 1, 2003; 40 on July 20, 2003; and 35 on March 2, 2004.  Defendant now argues that the GAF scale has not been endorsed by the Commissioner for use in determining disability, and hence, the lower scores are not evidence of disability.  Doc. 16, p. 11.  That argument is unpersuasive.  The GAF score of 55 in this case was considered by the ALJ to be important evidence.  The Commissioner cannot have it both ways.  It strikes me as odd that a GAF score would not be considered to be important evidence in a disability case.  A GAF score is an assessment by a mental health professional made at the time of treatment, and the opinions of treating physicians must be accorded substantial weight.  Lewis v. Callahan, *supra*.  While a GAF score, standing alone, may not be determinative of disability, it is certainly relevant evidence of disability.

Further, the ALJ is not permitted to pick only the evidence that will support one conclusion.

> A "substantial evidence" standard . . . does not permit a court to uphold
> the Secretary's decision by referring only to those parts of the record
> which support the ALJ.  A reviewing court must view the entire record and
> take account of evidence in the record which detracts from the evidence
> relied on by the ALJ.

Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  With the possible exception

of the score of 55, Plaintiff's scores (10 through 45) indicate very serious impairment in

functioning at school, socially, and a score less than 40 indicates impairment in

perception of reality.  There were two scores less than 40.

The ALJ cited Plaintiff's "activities of daily living" as evidence of a lack of

disability and as a reason to discount the testimony of Plaintiff and his mother.  The

Commissioner now argues that since Plaintiff watches television for extended periods of

time and plays video games, he does not have impaired ability to concentrate.  Doc. 16,

p. 10.  While remaining seated watching television or playing a video game might be

significant evidence of a *physical* ability to sit for an extended period of time, it is not

especially significant evidence about the mental ability of someone suffering from

schizophrenia to concentrate and persist sufficiently so that he could successfully work

an 8 hour day.

The ALJ discounted Plaintiff's testimony because he found that Plaintiff had been

inconsistent in his description of his marijuana use.  On March 20, 2003, on admission

to inpatient treatment, Plaintiff said he had used marijuana daily for two years, and had

last used four days earlier.  On May 1, 2003, Plaintiff said he had stopped using

marijuana two months earlier, but had used it twice in the intervening months.  At some

time in the three or four months after March 20, 2003, the date of the inpatient

admission to Vista, Plaintiff said he was using marijuana again once a week, but he did

not like how it made him feel.  On November 21, 2003, Plaintiff denied any current marijuana use.  There is no inconsistency in this pattern of admissions.  The period, from March 20, 2003, to November 21, 2003, is the period when Plaintiff's treatment and psychotropic medication first began.  It is not unreasonable to find that his cessation of the use of marijuana took some time over these months, and there might have been relapses.

The ALJ found Plaintiff's mental health treatment to be "non-aggressive" and "sporadic."  He also found that Plaintiff had "frequently" missed appointments.  He decided that there were insufficient objective clinical and laboratory findings of record to support a finding of disability or to support the testimony.  The chronology of Plaintiff's treatment is set forth above in detail.  Plaintiff spent about two weeks in inpatient treatment.  He then was continuously treated at Meridian Behavioral Health Care from May 6, 2003, through April 22, 2004.  R. 171-216.  He appeared for 12 medication management appointments and missed 3 appointments.  That is not a history of "frequently" missing appointments.  In any event, that a person suffering from schizophrenia does not attend every appointment is hardly evidence that the person is capable of attending a job 8 hours a day, 5 days a week.

Moreover, the ALJ did not explain what would have been "aggressive" treatment of schizophrenia.  Medication management with a strong psychotropic like Zyprexa, and a medication for side-effects caused by Zyprexa, is typical for treatment of schizophrenia.  The evidence plainly shows continuous treatment for a year, treatment in which Plaintiff actively participated.  The finding that treatment was "non-aggressive" is not supported by substantial evidence.  Further, the record contains numerous clinical

findings, including GAF scores, notations and treatment for side effects of medications, and observations concerning Plaintiff's speech, affect, and the frequency and severity of Plaintiff's experience of visual, tactile, and auditory hallucinations.  To say that the medical record lacks objective clinical and laboratory findings is wrong.

This leaves for consideration the ALJ's clinical analysis of Plaintiff's mental condition at the hearing.  The ALJ found that he had the Plaintiff's full attention, and  the Plaintiff had appropriate manner and appropriate responses to questions at the hearing. This is not substantial evidence to support the ALJ's decision.  In the Eleventh Circuit, it is not appropriate for the Administrative Law Judge, who is not a medical expert, subjectively to arrive at an index of traits that he expects the claimant to manifest at the hearing, and then to deny the claim when such traits are not observed.  Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).  The Eleventh Circuit has termed this "sit and squirm jurisprudence," and forbids that this method of analysis be used. McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988); Johns v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984).  It is proper, however, for the ALJ to consider the claimant's demeanor and appearance during the hearing as long as this is not in lieu of consideration of the medical evidence presented.  Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987).  "We do not accept an ALJ's mere reliance on his observation of a claimant during a hearing as the only basis upon which to reject a claimant's reference to pain."  Norris, 760 F.2d at 1158.

In summary, the ALJ's rejection of Plaintiff's childhood impairment claim is not supported by substantial evidence in the record.  The evidence rather strongly suggests

that Plaintiff was "severely" impaired in three domains, in his ability to acquire and use information, to attend to and complete tasks, and to interact and relate with others. Only one severe rating was needed to find a childhood impairment.  Indeed, the criteria of childhood Listing 112.03 seems to have been rather solidly met, that is, there was evidence of (1) delusions or hallucinations, (2) poverty of content of speech, (3) flat, blunt affect, and (4) emotional withdrawal, apathy, and isolation, each continuously for at least 6 months, and the criteria of Listing 112.02.B.2, marked impairment in (1) social functioning, and (2) in maintaining concentration, persistence, or pace.

These observations apply equally to the ALJ's rejection of Plaintiff's adult impairment claim.  None of the evidence discussed by the ALJ is substantial evidence to support the decision.  Again, the criteria for Listing 12.03 for adults, schizoprenia, appear to have been met.  There is evidence that Plaintiff suffered from (1) delusions or hallucinations, (2) had blunt affect, and was (3) emotionally withdrawn and isolated (only one of these categories need to be manifest), resulting in (1) marked restrictions in activities of daily living, (2) social functioning, and (3) maintaining concentration, persistence, or pace (only two of these categories need to be manifest).

This court should not, however, make these determinations in the first instance. A remand is recommended to permit the Commissioner to reconsider these two claims, with the understanding that the evidence relied upon to date for the decision is not substantial evidence.

A remand is also needed because the medical records seem to be incomplete. The medical records end on April 22, 2004, while the administrative hearing was not until January 19, 2006, nearly two years later.  Perhaps Plaintiff's condition improved

substantially after April 22, 2004.  Then again, perhaps he has received psychiatric treatment continuously since April, 2004, and in that event, consideration of that history of treatment would be important.  The primary claim here is not the childhood claim but the adult claim.  A remand would also be useful to allow the Commissioner the opportunity to obtain an appropriate mental residual functional capacity assessment by Plaintiff's current treating physician.

**Conclusion**

Considering the record as a whole, the findings of the Commissioner failed to follow the law and are not based upon substantial evidence in the record.  The decision of the Commissioner should be reversed and the claims remanded for additional evidence and for reconsideration.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and remanded to obtain additional evidence, additional medical records, and a mental residual functional capacity assessment by Plaintiff's treating physician, and for reconsideration consistent with this report and recommendation.

**IN CHAMBERS** at Tallahassee, Florida, on October 24, 2007.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.

Case No. 1:07cv15-MP/WCS